# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| BRADLEY A. ESTABROOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:16-CV-87-HAB |
| | ) | |
| MAZAK CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the Court on a slew of filings made by both parties. Currently pending from Plaintiff are his: Motion for Partial Summary Judgment [ECF No. 75] with supporting Brief [ECF No. 76] and Statement of Material Facts; Response in Opposition to Defendant's Motion for Summary Judgment [ECF No. 86] with supporting Appendix [ECF No. 86-1]; Response to Defendant's Motion to Strike [ECF No. 91]; Motion to Strike [ECF No. 92]; Reply Brief in Support of his Motion for Partial Summary Judgment [ECF No. 93]; Second Motion to Strike [ECF No. 101]; Response to Defendant's Second Motion to Strike [ECF No. 102]; and Reply to Defendant's Response to his First Motion to Strike [ECF No. 103].

For its part, Defendant's submissions include: Motion for Summary Judgment [ECF No. 78] with supporting Designation of Evidence [ECF No. 79], Statement of Material Facts [ECF No. 80] and Memorandum of Law in Support [ECF No. 81]; Response to Plaintiff's Partial Motion for Summary Judgment [ECF No. 87] with supporting Appendix [ECF No. 88]; Motion to Strike Certain Portions of Plaintiff's Statement of Material Facts and Appendix of Exhibits [ECF No. 89] with Supplemental Appendix [ECF No. 90]; Corrected Supplemental Appendix to Defendant's Motion for Summary Judgment and Motion to Strike [ECF No. 94 and 97]; second Motion to

Strike Certain Portions of Plaintiff's Statement of Material Facts and Appendix of Exhibits [ECF No. 95]; Reply in Support of Summary Judgment [ECF No. 96]; Response to Plaintiff's Motion to Strike and Motion to Consider Defendant's Supplemental Appendix filed as Docket Entry 90 [ECF No. 98]; Motion to Consider Supplemental Exhibits, Statement of Genuine Disputes, and Correct Citation Error [ECF No. 99]; Reply in Support of Pending Motions to Strike [ECF No. 100]; second Reply in Support of Pending Motions to Strike [ECF No. 104]; and Response to Plaintiff's Second Motion to Strike [ECF No. 106]. These filings, which far exceed 1,000 pages, were all made prior to this matter being reassigned to the undersigned on May 1, 2019. [ECF No. 107].

During a May 28, 2019, Telephonic Status Conference, the parties asked the Court to withhold ruling on the pending motions while the parties engaged in mediation. [ECF No. 110]. The Court received a letter from the mediator on August 12, 2019 [ECF No. 111], advising that mediation was unsuccessful. In the interim, Defendant sought the recusal of the undersigned due to a more-than-decade-old professional relationship with John Theisen, one of the attorneys representing Plaintiff. [ECF No. 112]. The Court denied that motion on September 11, 2019. [ECF No. 113]. While this matter is now ripe for determination, the Court nonetheless concludes that a ruling is inappropriate currently. For the reasons set forth below, the Court concludes that this matter presents an issue of state law that is determinative of the case and on which there is no clear controlling precedent. *See* Ind. App. R. 64. Therefore, it is necessary that the determinative question in this case be certified to the Indiana Supreme Court.

**FACTUAL BACKGROUND**

This matter involves a horrific workplace accident that occurred on November 7, 2014. At the time of the accident Plaintiff, Bradley A. Estabrook, was employed as a maintenance technician

by General Products Corporation ("GPC"), an auto parts manufacturer located in Angola, Indiana. Defendant, Mazak Corporation, is a wholly owned subsidiary of a Japanese manufacturer (Yamazaki Mazak Corporation) of Computer Numerically Controlled ("CNC") machinery. It appears, at least with respect to the machinery at issue, that Defendant acted as the U.S.-based sales and installation service for machinery that was manufactured in Japan.

The machinery involved in this case is Defendant's Palletech System, a "high-productivity unmanned system" for loading and stocking pallets of manufactured goods. At GPC, the Palletech System was comprised of seven CNC machines, model number FH6800 (the "FH6800s"), sharing a common pallet loader robot that traveled on a rail system between the FH6800s. The floor plan layout of the system looked like this:



Installation of the system was completed on July 24, 2003, and was performed entirely by Defendant's employees. The total cost to GPC for the Palletech System was approximately $3.4 million.

The alleged defect in this case is a gap that is located at the front end of each of the FH8600s. *See* ECF No. 77-60. The gap is located at the bottom of the loader doors and its purpose is to allow a forklift to "come in underneath the pallet and pick the pallet up." ECF No. 77-28 at 4. Stated another way, the gap allowed access to pallets on the loader robot as it stopped at each FH8600 via the rail system. While the gap was useful from an access standpoint, it also created a potential "pinch point" when the loader robot passed by. GPC's employees, including Plaintiff, were generally aware of the possibility of a pinch point at the location of the gap but never gave it much thought.

Beginning in summer 2014, GPC experienced problems with Machine 5, one of the FH8600s in the Palletech System. Both GPC and Defendant made several attempts to fix the issue through the summer and fall. Plaintiff's work on November 7, 2014, was part of these ongoing attempts. Although power to Machine 5 was cut off during Plaintiff's work, the pallet loader robot continued to travel back and forth on the rail system to service the other FH8600s. This was an advertised feature of the Palletech System – the system was designed to continue operating even if one of the CNC machines was inoperable.

While Plaintiff was working inside of Machine 5, he dropped a wrench he was using for the repairs. As he bent over to retrieve the wrench, his right foot inadvertently went through the gap at the bottom of the loader door on Machine 5. At the same moment the pallet loader robot passed by on the rail system, catching Plaintiff's foot. The damage to Plaintiff's foot was

significant, as the foot was nearly sheared off above the ankle.[1] As a result, Plaintiff has undergone several surgeries, the most recent of which was an ankle fusion on January 25, 2017. The only remaining medical option if the fusion fails is the amputation of the foot above the ankle. Plaintiff is not expected to work again.

### WORK PERFORMED ON THE PALLETECH SYSTEM BETWEEN ITS INSTALLATION AND NOVEMBER 7, 2014

For reasons that will become obvious later in this Opinion, the most contentious issue between the parties is the characterization of work performed on the Palletech System from 2011 through 2014. The actual work performed is undisputed. On December 6, 2011, Defendant performed what its work order described as a "FMS Carrier Rebuild," or in layman's terms the replacement of several components on the upper part of the pallet loader robot. This involved: the replacement of the carrier gears and bearings as well as the carrier drive shaft and transmission; replacement of all cam followers, gears, shafts, transmission, and bearings; the installation of new chains; and a re-calibration of the equipment. (*See* ECF No. 79-6 at 4). The entire Palletech System was down during these repairs, as the robot had to be removed from the tracks and placed on the factory floor to allow better access to the robot. GPC was charged $7,218.75 for labor and $6,228.86 in parts for the repairs.

On January 15, 2013, Defendant replaced the "main computer that runs the whole system." [ECF No. 77-37 at 23]. The entire Palletech System was down during the installation. GPC was charged $1,825.00.

On March 4, 2013, Defendant installed a "digi box" and "digi board" into the main computer to address ongoing issues. GPC was charged $357.50 for the installation.

---

[1] Photographs of Plaintiff's injury are located in the record at ECF No. 77-23. The Court warns the reader that the photographs are graphic in nature.

Defendant installed a new hard drive into the first FH8600 machine and performed general troubleshooting on March 20, 2013. Without that hard drive, the "whole line is down." [*Id*. at 25]. Defendant charged GPC $2,475.00.

On March 11, 2014, Defendant performed what its work order described as "Rebuild FMS Carrier Lower Part." [ECF No. 77-51]. This work involved the installation of new lower end shaft bearings and gears on the pallet loader robot, as well as checking its operation across the length of the rail system. The work was similar to that performed on December 6, 2011, except this time to the lower part of the robot. All work was performed during a weekend when the Palletech System was down. GPC was billed $7,957.50 for the labor involved.

All the foregoing work was performed at GPC; no part of the Palletech System was ever removed from the GPC factory for service. The Palletech System also continued to operate during this period (except where noted) notwithstanding the issues necessitating the work.

Apart from the work on the Palletech System generally, there was additional work performed on Machine 5. On November 3 and 4, 2014, Defendant provided labor only related to work performed on a cylinder inside of Machine 5. GPC was charged $2,955.28 for the labor. GPC also performed work to Machine 5 on its own. This included pulling spindles out, rebuilding the gear box, tearing down the B-axis, and work on the servo drives, power supply, and spindle. Defendant was not involved in any of these repairs. While it appears that Defendant provided the parts for GPC's repairs, GPC could have ordered the repairs from any supplier.

**LEGAL ANALYSIS**

This dispute is governed by the Indiana Products Liability Act, Ind. Code § 34-20-1-1 *et seq.* (the "Act"), which governs all product liability actions in Indiana regardless of the substantive legal theory. Ind. Code § 34-20-1-1; *Robinson v. Davol Inc.*, 913 F.3d 690, 693 (7th Cir. 2019).

The threshold issue in this case deals with the Act's statute of repose, codified at Ind. Code § 34-20-3-1(b). That statute provides:

> Except as provided in section 2 of this chapter, a product liability action must be commenced:
> (1) within two (2) years after the cause of action accrues; or
> (2) within ten (10) years after the delivery of the product to the initial user or consumer.
> However, if the cause of action accrues at least eight (8) years but less than ten (10) years after that initial delivery, the action may be commenced at any time within two (2) years after the cause of action accrues.

*Id*. The parties agree that the strict application of the statute of repose to the delivery date of the Palletech System in this case, July 24, 2003, would bar Plaintiff's cause of action. However, both parties have identified a judicially created exception to the statute of repose whereby the rebuilding or reconditioning of the product can re-start the statutory clock. The primary dispute between the parties is how that exception applies to the facts set forth above.

The Court, however, believes that an examination of the exception itself must be undertaken first. The exception has questionable provenance, having been created by a federal district court and then incorporated into Indiana law via dicta. Thereafter, both federal and state courts have applied the exception reflexively, with little if any analysis of its validity or basis in the statute. The Court has considerable questions, then, as to whether the exception would be recognized by the Indiana Supreme Court and, if so, how the exception would be defined.

The first appearance of the exception was in *Denu v. Werstern Gear Corp.*, 581 F. Supp. 7 (S.D. Ind. 1983). There, the plaintiff was injured by a printing press that his employer had purchased as a "reconditioned press." The press was sold as-new in 1964, sold to plaintiff's employer in 1975, and plaintiff's injury occurred in 1979. The defendant moved for summary judgment, arguing that the statute of repose ran from the date of the original sale and that the

subsequent sale had no effect on the running of the statute. *Id*. at 7–8. However, the plaintiff contended that the subsequent sale created a new product, resetting the statute of repose. *Id*. at 8.

The Southern District recognized that the plaintiff's argument was novel, stating that it had been "unable to find any cases applying Indiana's product liability statute to a situation involving the sale of a reconditioned product and the parties have not cited to the Court any such cases." *Id*. In the absence of any Indiana authority, the Southern District concluded that it was "possible" that the sale of a reconditioned/renovated product could amount to the reintroduction of the product into the stream of commerce, thereby resetting the statutory clock. *Id*. In less than authoritative language, the court concluded that "the introduction into commerce of a reconditioned product by a manufacturer may give rise to expectations of safety which would support a products liability action." *Id*. The court ultimately concluded that it could not determine whether such an exception would be applicable since the record did not contain any information as to "what changes, if any, were made to the press sold in 1964 upon its subsequent sale in 1975, and what the effect of such changes were upon the nature of the product sold." *Id*. *Denu*, then, was equivocal as to whether the exception existed at all and provided no guidance whatsoever as to how the exception should be applied.

The *Denu* decision was not revisited until 1993 when it was cited in *Wenger v. Weldy*, 605 N.E.2d 796 (Ind. Ct. App. 1993). There, the plaintiff argued, citing to *Denu*, that a repair made to the hitch of a hay baler created a new product, thus re-starting the ten-year statute of repose. *Id*. at 797–98. Given the lack of Indiana authority, *Wenger* went on to discuss *Denu* as "instructive," stating, "[i]n *Denu* it was determined that Indiana's statute of limitations would not bar an interpretation allowing recommencement of the statute when a product has been reconditioned, altered, or modified to the extent that a 'new' product has been introduced into the stream of

8

commerce." *Id*. at 798. The court, however, ultimately concluded that the issue was irrelevant since, even had the statute of repose re-started at the time of the repair, the claim would still have fallen outside of the ten-year period. *Id*. *Wenger*, then, at least superficially extended the *Denu* exception beyond the sale of a reconditioned product to the reconditioning of an owned product, but did so only via dicta, and with little analysis beyond the quote above.

The *Denu* exception would be greatly expanded by Judge Posner later that year in *Richardson v. Gallo Equipment Co.*, 990 F.2d 330 (7th Cir. 1993). *Richardson* involved the installation of an allegedly defective back up alarm on a forklift, and whether the installation of that alarm re-started Indiana's statute of repose. Despite noting that "authority is sparse," Judge Posner nonetheless determined it "clear" that "any reconstruction or reconditioning (as distinct from a mere repair – a familiar distinction in other areas of the law) which has the effect of lengthening the useful life of a product beyond what was contemplated when the product was first sold starts the statute of repose running anew." *Id*. at 331 (citations omitted). This rule was necessary, Judge Posner asserted, because "[o]therwise the statute would create an inefficient incentive to reconstruct or recondition old products rather than build new ones, in order to reduce expected liability costs; for under such a regime a product rebuilt after ten years would be immunized from liability."[2] *Id*. The case was ultimately decided on other grounds, as it was determined that there was "no suggestion that the warning devices extended the useful life of the forklift." *Id*. Again, then, the *Denu* exception was discussed solely in the context of dicta.

---

[2] The case at bar arguably calls the existence of this "inefficient incentive" into question. The Court finds it difficult to accept that Defendant would forego the sale of a new Palletech System, which cost approximately $3.4 million in 2003, in order to perform four-figure repairs for the sole purpose of reducing expected liability costs. Indeed, the Learned Hand Formula would describe such conduct as manifestly unreasonable except in the case of the most obvious defective condition.

9

The Court finds noteworthy the cases relied upon by *Richardson* in declaring its rule. *Richardson* cites to *Denu*, as well as two district court decisions from Tennessee: *Rollins v. Cherokee Warehouses, Inc.*, 635 F. Supp. 136 (E.D. Tenn. 1986) and *Fugate v. AAA Mach. & Equip. Co.*, 593 F. Supp. 392 (E.D. Tenn. 1984). The common denominator across each of those cases is that they address the *sale* of reconditioned goods rather than the *reconditioning* of already-owned goods. Indeed, both Tennessee cases turned not on an interpretation of the relevant statute of repose but instead on the definition of a "seller" or "manufacturer" under the Tennessee products liability act. *See Rollins*, 635 F. Supp. at 138–39; *Fugate*, 593 F. Supp. at 393. While *Richardson* appears to greatly expand *Denu*, the legal basis it uses to do so fails to support that extension.

Neither *Denu* nor the expanded rule in *Richardson* has received extensive consideration by an Indiana court in the intervening years. *Johnson v. Kempler Indus., Inc.*, 677 N.E.2d 531 (Ind. Ct. App. 1997), cited to both *Denu* and *Richardson*, but ultimately provided no analysis of either case because the court determined that there was no evidence that the allegedly defective product had been reconditioned. *Id*. at 536–37. *Denu* receives more attention in *Lenhardt Tool & Die Co. v. Lumpe*, 703 N.E.2d 1079 (Ind. Ct. App. 1998), but not in the context of the statute of repose. Instead, *Denu* is cited as support for the ultimate holding that "where an entity reconditions, alters, or modifies a product or raw material to the extent that a new product has been introduced into the stream of commerce, the entity is a manufacturer and provider of products under the Act." *Id*. at 1087.

The most relevant discussion of the exception by an Indiana court is in *Florian v. Gatx Rail Corp.*, 930 N.E.2d 1190 (Ind. Ct. App. 2010). There, the plaintiff claimed that his claim was exempt from the statute of repose because the manufacturer of a railroad tank car has repainted the car within ten years of the suit and, relying on *Richardson*, that the repainting amounted to

reconstruction or reconditioning of the car. The Court of Appeals discussed *Richardson* and seemingly applied it, stating that "[w]e are simply unable to agree with Florian that this repainting constitutes incorporation of a 'new component' to the tank car." *Id*. at 1201.

However, even *Florian* is problematic as an example of an Indiana court adopting the *Denu* line of cases. Most of the decision is spent determining whether the plaintiff's claim was preempted by applicable federal safety regulations. *Id*. at 1195–1200. The court concluded that it was. *Id*. at 1200. While the court later distinguished between the plaintiff's "common-law negligence" action and his "product liability" claim, *id*. at 1202, it is not at all clear that such a distinction exists. *See Dalton v. Teva N. A.*, 891 F.3d 687, 691 (7th Cir. 2018) (noting that the Act "governs all consumer actions against a manufacturer for physical harm caused by a product, 'regardless of the substantive legal theory or theories upon which the action is brought.'"). Thus, the holding of *Florian* is likely limited to the preemption discussion, rendering the discussion of *Richardson* to dicta. And even if *Florian* does incorporate the *Denu* line of cases into Indiana law (*see Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 815 (7th Cir. 2014)), it provides little direction as to how the exception is applied given the extremely limited "reconditioning" performed. With the Court unable to find any additional Indiana authorities addressing the issue, the Court is left to conclude that no Indiana case has ever expressly adopted and applied *Denu* to extend the statute of repose due to post-sale repair/reconditioning by the seller.

*Denu* has received more analysis from federal courts, but its application has been inconsistent. Perhaps no case best highlights that inconsistency better than *Whitaker v. T.J. Snow Co.*, 953 F. Supp. 1034 (N.D. Ind. 1997), a case relied upon by both Plaintiff and Defendant. In *Whitaker*, the plaintiff sought to hold a third-party entity (Snow), not the original manufacturer, liable for injuries under the Act as a result of certain refurbishing work Snow performed on a seam

welder. The plaintiff sought to hold Snow liable under two theories relevant here: that Snow had placed the welder into the stream of commerce by virtue of the refurbishment; and that Snow created a new product by virtue of the refurbishment. *Id*. at 1040, 1042.

In the context of the stream of commerce, *Whitaker* appears to take *Denu* back to its factual roots. The court noted that both *Denu* and *Wenger* involved situations in which the defendant has sold or leased a refurbished product. However, the court found that "there is no evidence that Snow either sold, leased, or bailed the seam welder to Walker after refurbishing it. Nor is there any evidence that the seam welder was otherwise introduced (or reintroduced) into the stream of commerce after the refurbishing work was performed by Snow." *Id*. at 1042. At this point in the opinion, then, *Whitaker* appears to limit *Denu* and its exception to the statute of repose to resellers.

Only two pages later, *Whitaker* casts doubt upon that conclusion. Citing to *Richardson*, *Denu*, and *Wenger*, the court held that "[r]econditioning or reconstruction of a product, as opposed to mere repair, 'which has the *effect* of lengthening the useful life of a product beyond what was contemplated when the product was first sold' creates a new product under the Act." *Id*. at 1044 (original emphasis). Although the court determined that there was no evidence that the refurbishment lengthened the life of the welder, the product/service analysis in *Whitaker* can be read as extending *Denu* to the reconditioning of currently owned products, just as it was in *Richardson*.

The Court would note that, for all the discussion of *Whitaker* in the parties' briefs, the issue of the statute of repose was not before the court in that case. By the time of the *Whitaker* decision, the district court had already granted summary judgment for the manufacturer that had sold the welder to the plaintiff's employer outside of the ten-year statutory period. *Id*. at 1035. All of Snow's work was within the statute of repose. *Id*. at 1037–39. Thus, the precise issue before the

12

Court, whether remediation work by the seller can restart the statute of repose, was neither before nor answered by the court in *Whitaker*.

The parties also rely on *Miller v. Honeywell International Inc.*, 2001 WL 395149 (S.D. Ind. Mar. 7, 2001) in support of their arguments. There, the Southern District found that *Denu* provides "some support" for the proposition that "if a product is rebuilt *by the original manufacturer*, then the original manufacturer should be treated as having introduced a new product into the stream of commerce." *Id* at *7. However, the court ultimately held this proposition to be irrelevant, since "the facts on the record unequivocally show that the Defendant, as original manufacturer, did not rebuild the engine and then reinject it into the stream of commerce. Rather, the Army, who was the initial consumer, rebuilt the engine and then continued to use it for its own purposes." *Id*. at *8. *Miller*, then, does little to inform the discussion.

Finally, the parties rely upon *Hartman*, in which the plaintiff claimed that the installation of a conversion kit onto a muzzle-loaded rifle acted to re-start the statute of repose. *Hartman* relies primarily on *Richardson*, particularly that portion of the *Richardson* decision where Judge Posner announced the exception to the statute of repose where a manufacturer refurbishes a product to extend its useful life. *Hartman*, 758 F.3d at 814. As noted above, Judge Posner qualified this exception by noting that the authority supporting it was "sparse." In any event, *Hartman* places the focus on the requirement that the refurbishment extend the useful life of the product, holding that the conversion kit could not reset the statutory clock because "the conversion kit may make the gun more powerful, but it has no effect on either the barrel or bore and therefore has no effect on how long the gun will be usable." *Id*. at 815.

In summary, the exception to the Act's statute of repose at issue in the parties' briefs was created in *Denu* in a very different factual context than the one at bar, and then extended by

*Richardson* despite what the court conceded was "sparse" authority in support. The exception finds no philosophical grounding in any Indiana decisions; those Indiana decisions that recognize the exception do so in a perfunctory fashion, with little to no actual analysis, and often in discussions that have no bearing on the outcome of the case. None of those decisions come from the Indiana Supreme Court. This Court is left, then, to wonder whether the exception would be recognized by the Indiana Supreme Court and, if so, what the contours of the exception would be.

Indiana Appellate Rule 64 states that a district court "may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling precedent." The Court finds that Plaintiff's claims fall within this Rule. The Court cannot determine whether Plaintiff's claim can survive the Act's statute of repose without first knowing whether post-sale work performed by the seller can extend the deadline. Even if the extension in *Denu* and the resulting cases exists, the Court cannot meaningfully apply it to the facts of this case because no Indiana court has provided guidance as to the relevant test for applying the exception. To resolve the uncertainty regarding this dispositive question, this Court will certify the question to the Indiana Supreme Court.

The Justices of the Indiana Supreme Court may reformulate this question if they determine that course to be appropriate. Nothing in this certification is intended to limit the scope of their inquiry.

**CONCLUSION**

For the foregoing reasons, the Court hereby CERTIFIES the following question to the Indiana Supreme Court:

> Can the statute of repose codified in Ind. Code § 34-20-3-1(b) be extended by post-sale repair/refurbishment/reconstruction of the product and, if so, what is the
14

appropriate test to be used to determine whether the seller has done sufficient work to trigger the extension?

Pursuant to Ind. App. R. 64(B), the Clerk is DIRECTED to provide the Indiana Supreme Court with copies of: (1) this Opinion and Order; (2) the docket in this case, including the names of the parties and their counsel; and (3) the Second Amended Complaint [ECF No. 35]; Supplement to Second Amended Complaint [ECF No. 49], and Answer [ECF No. 65].

SO ORDERED on October 22, 2019.

                                        s/ Holly A. Brady  
                                        JUDGE HOLLY A. BRADY  
                                        UNITED STATES DISTRICT COURT